of Nancy Heisler. Before a woman asks for a cost of living adjustment to transfer from Des Moines, Iowa, to a suburb of Philadelphia, her husband pulls the rug out from underneath her, and he frustrates her career. Everything changes at that point. And the reason for this, he tells us, is that the resulting   loss to Philadelphia, and he remains in Des Moines, would mean that it would probably be very close to his own pay in Des Moines. This is someone prior to that point, this supervisor, he describes her as someone that if he were without her that he would be lost. After this happens, she is someone who lacks executive presence and political savvy. There were a few not completely positive comments, though, before this, right? Certainly. With any performance evaluation, I mean, I know I've gotten performance evaluations where there's always constructive criticism. You don't have to testify. Go ahead. That was certainly the case here. I want to point out one important thing, and that's this. In 2011, Judge Benton, if you look at communication, which is really what we're talking about here, here is what Mr. Crosser, her mail boss, says about her. He says that she is a good leader. He says that she is respected by her team. He says that she promotes an engaging work environment. And in the performance evaluation, immediately before she asks for the cost of living allowance adjustment, he rates her a 5, the highest score in communication. This all changes after she asks for the pay adjustment, a pay adjustment where he says this would then raise her pay to something very close to his own, a man. And after this point, after this request, she is a woman who is, in his words, too direct. Before her request, he promotes her three times, including to an officer position at Nationwide. After she asks for the cost of living adjustment to move from Des Moines to Philadelphia, he is on panels that deny her jobs seven times. And he is a decision maker on those, another five of which he gives feedback. How many of those are before August 10, 2014? All of them are after August 2014. The seven in those panels say she's too direct. And he then provides feedback in another five of the panels. So 12 of the 32 positions in this case, more than a third of the positions, he is either a direct or an indirect decision maker. And what's interesting about this is this comment that she herself is too direct. In the number of job postings, this term is something that is not defined in any real way, except by Ms. Klett, who says that what she's too direct about is that she's asking for a cost of living adjustment to move from Des Moines to a suburb of Philadelphia. That's what Ms. Klett says herself. And Ms. Klett herself, she had no idea, she was not involved in the transaction. One can only assume that she learned this information from Mr. Crosser himself. When we're talking about the prima facie case, and I believe that's what the court is saying, what we have to look at is where they are relying upon factors that are not objective. And that's what they're saying here. They're not saying, for most of these, that the reason that they're not hiring her is because she lacks the qualifications. In fact, they admit that for every one of these positions, she's qualified. So we meet the prima facie case. It comes down to the legitimate business reason. And their executive presence. That she doesn't have political savvy. And this is fascinating, because this term is not something that is anywhere in writing, in any of their job descriptions, until the 15th one. The one after she complains about the fact that she's being treated unfairly. The fact that she's being treated inequitably. Now, for the first time in the job description, it says political savvy. At what point was this she is too direct statement made? Right at the time when Mr. Crosser, the Harleysville position. So this is in or about November of 2011. So the date in particular is on November 30th of 2011, which is the email transaction that occurs where she's asking for the cost of living allowance to move from Des Moines to Philadelphia. And what I want to stress is that Mr. Crosser says what is, why he is so offended by this. He's offended because her pay at that point, by his estimation, would be very close to his own, even though she's in a suburb of Philadelphia and he remains in Des Moines, Iowa. That is what offends him here. He says that she is too direct. He says that she is leading with compensation. Importantly, remember that she had already been on this project for three and a half months. She was irresponsible for integrating this insurance company into Nationwide. That was her job. So they had already worked out all the other details. The only detail that really was at issue was if she was going to be there full time, not living in Des Moines. She asked that. She said, I'd like to remain in Des Moines. They say, no, you have to go to a suburb of Philadelphia. And she says, okay, I just want to make sure that the cost of living, I've got that taken care of. Counsel, you've characterized it repeatedly as a cost of living adjustment, but I think the record was that it's at least $25,000. How would you respond to the argument that Mr. Crosser was not discriminating on the basis of her sex, but that he was just angry that she had basically not taken advantage of the opportunity? The reason is we look at what happens with Mr. Graham. Mr. Graham, when he doesn't want to move from Columbus to a suburb of Philadelphia, his directness is rewarded. Mr. Graham is told, hey, you don't have to go to a suburb of Philadelphia. You can remain in Columbus and you can do the job, the job that she's now passed over for from $25,000. She doesn't say that, though, does she, in her email blowing it off? She doesn't say that, does she? It actually she does, and this is on page 13 of the record, and I'll just read it. It says that I hope that we can consider other options as I really want to be involved in the project. This is at the bottom of page 13. For a smaller additional amount over the current offer and normal travel expenses reimbursement, I would be willing to commit to spend additional time in my current position from my current home base traveling to Harleysville for somewhere between a quarter and half my time. So the answer is yes, to my question. Yes, she proposed. She proposed an alternate arrangement. Mr. Crosser, right, there's no response at all. He walks down to her office and he says, you know, she had been going to traveling back and forth from Harleysville for several months at this point because she's the point person there. He says, you're not going. What's the linchpin of your case? It's whether Crosser discriminated against your client because of the wrong that they committed, legal wrong that they committed. Directly it's gender, Judge Woolman, and he was fine. She was too direct because she was a woman. Is that implicit or did he ever use that word? Did he ever, to what extent did he, is it so clear the implication that she's too direct because she's a woman? He did use the word too direct. There's no question about that. It's in the record. It may very well have been that. I don't know her, none of us know her, and maybe that's a positive attribute, but maybe the real reason was she wanted more than they thought she was worth. Completely get it. And here's the response. In other words, it's a person entitled to get what they want. In other words, they may not have treated her very nicely, but what's your closest case on point to support your theory of recovery? I think it's the Hopkins case where you have someone who is viewed through the same prism as someone who does not fit the mold. And here's what we have. We know that under the law we can prove our case not just through direct evidence, and that would be direct. You're too direct because you're a woman and we're not going to hire you. But that happens in so few cases. So the case law allows us to prove through circumstantial evidence. And that's what we have here. We have a direct comparator. This happens in one in a thousand cases. We have a direct comparator in Mr. Graham. Mr. Graham is someone who is not required. He gets the job, the very job in Harleysville, the suburb of Philadelphia that Ms. Heisler was applying for and that she had been working in, and he was not required to move to the suburb of Philadelphia. His directness was rewarded under the circumstances. He worked from Columbus and he did exactly what she had proposed in her email as an alternate option if they weren't willing to give her the cost of living allowance. And had she been a man, none of this would have happened to her? In fact, we have. If she had been Mr. Graham, it wouldn't have happened to her because we have Mr. Graham. You have the comparator, in other words. How do we pronounce that word? The person with whom she's compared, right? Yes, sir. That's right. I'd like to reserve just a few minutes on rebuttal. I'm happy to answer any other questions. I will just say one thing, too, is remember that she does go to Ms. McVeigh, and this is important. She does go to Ms. McVeigh in the spring of 2013. She says, I need help here because I am being treated inequitably. And she provides examples of at least two men that are comparators that she's being treated differently from. And that, Ms. McVeigh, is on these panels as well. If you take the number of panels that Ms. McVeigh is on, it's over half of the 32 panels. Either Mr. Crosser directly or indirectly, or Ms. McVeigh, who is the HR person responsible for receiving and investigating her complaint of discrimination. Thank you for your argument. We'll hear from Ms. Devaney. May it please the Court. Jeannie Devaney on behalf of Nationwide. I want to just address a few of the things that Ms. Heisler's counsel mentioned just a minute ago. The record in this case, or the briefing in this case, has been plagued with statements that are not supported by the record. That has happened again here today. Mr. Crosser was not on seven panels for jobs that Ms. Heisler applied for after August of 2014. He was on two. And I do not recall anywhere in the record where Mr. Crosser is discussing the reason that he did not want to give Ms. Heisler a pay increase was due to his own pay. There is discussion of her executive presence and problems with that prior to 2011, which is in statement of fact 41 and 42. And there is no evidence in the record that Mr. Graham said he did not want to move and that is why he did not have to move. As a matter of fact, Ms. Heisler admitted in response to statement of fact 69 that she had no reason to believe that at the time the job was offered to her, that relocation would not be required. This was a brand new business that they had just acquired. They thought that relocation was going to have to be required. Ultimately it was not. She does not have any reason to believe that was known at the time the job was offered to her. I want to talk a little bit about the email because they do focus on this email as the turning point. Leading up to the point that Ms. Heisler sent that email, she admits that Mr. Crosser worked very hard to ensure that she got that job offer. She also admits that he knew she was worried about cost of living and therefore he worked hard to get her a significant increase for a lateral move. The increase that he was able to offer her was a $25,000 a year pay increase and after he worked to do this, her response was and I quote, it should come as no surprise that I was very disappointed and disengaged by the offer presented. She further stated that she quote would not consider it unless they offered another $25,000 and that her position was quote non-negotiable. Mr. Crosser adamantly denies doing anything to derail Ms. Heisler's career but even assuming that he did, there are two significant problems with her. You do acknowledge don't you that there was a dramatic change in Mr. Crosser's attitude and actions toward Ms. Heisler from that point on? I acknowledge that he was upset when he got that email. I think it has zero to do with her age or her gender but I acknowledge and he admits that he was upset. He perceived it as problematic and evidence of the communication problems that he had talked to her about in the past but moving forward, the question then becomes what happens with the positions that she applied for and to the point that this court made a minute ago, Ms. Heisler has to prove not only that the people who got those positions were less qualified than her but that they were significantly less qualified than her and of in my arguments on several positions and so there are currently seven left. Of those seven, Mr. Crosser was only involved in two of them and they were both panels and he was only one of the panels, only one of the panel members and the other folks that were involved and actually let me take that back. I think he was only a panel member in one. The three AVP positions that were posted in October of 2014 immediately after the reorganization. Mr. Crosser was a panel member on those positions. He was not a panel member on any other position after August of 2014. Back to this, he was upset. When exactly did that occur in the sequence? That was in 2011 and he was upset by the email but the idea that he carried that forward for years later is not supported by the record. As a matter of fact, he met with her in 2012 in an attempt to help her with her professional development. He offered her a connection with HR, an executive coach. He offered to work with her on interviewing skills. She rejected all of these things. So yes, he was upset by the email. No, I don't think the record supports the idea that he had a dramatic attitude change in her toward her after the 2011 email. But I would also submit that even if he did, that had nothing to do with her gender or her age and again... It does seem, counsel, like her career trajectory just flatlined from that point on. I don't even know that I agree with that. The evidence is that from 2005 to 2012, she basically had the same position. She then at that point starts looking for other positions and is not doing the things that her peers are doing in order to put herself in a position to find certain jobs because she doesn't think they will offer her anything. So she doesn't do those things. So I think the idea that she was on this upward path is also not supported by the record. He did give her promotions early in her career. Once there's this reorg, many people found themselves scrambling to find jobs. The three people besides Ms. Eisler who were not selected for those October 2014 positions were younger men. So again, the lack of evidence of discrimination is apparent from the record. Do you think they make a prima facie case that's supposed to be easy to do? We have not ever disputed that they, for purposes of this motion, make a prima facie case. And I don't know why that has never been a dispute. But in order to make sure I understand, you've never disputed the establishment of a prima facie case? I should clarify and say in instances where a female was selected, then we do not otherwise. She has made the prima facie case. Are there two cases where a female was selected? Of the seven at issue, there are two. Where a female was selected. Correct. What was the age of the female selected? Compared to hers. I don't mean the exact age. They were younger. Both younger. Go ahead. But the law is clear, and I want to read a case, in this court's decision in Torgerson, and notes that the United States Supreme Court has agreed with the following statement, that in order to prove pretext in a failure to hire or failure to promote case, and here's the quote, the disparities and qualifications must be of such weight and significance that no reasonable person in the exercise of impartial judgment could have chosen the candidate selected over the plaintiff for the job in question. Which of our cases are you quoting from? I'm quoting from Torgerson. I see. Which is quoting from Right. Okay. Thank you. And so she has to show that the person selected was significantly less qualified than she was. If you look at the hiring decisions, and starting with the AVP positions in October of 2014, and you look at the evidence that the district court was provided on those positions, Ms. Heisler provides no evidence of the comparative qualifications for those three positions. Zero. You can look at the joint appendix pages 1384 to 1390, and in those responses to our statements of fact, that's where she provides her evidence, and she talks only about herself. She does not talk about the qualifications of any of the three people who actually got those positions. Counsel, does that relate in any way to the motion to supplement that was denied? It does not. It does not for two reasons. First of all, the qualifications that are included in the motion to supplement do not and there's a second reason that's now escaping my mind, but I'll get to it. And I guess the second reason is this. So on appeal, in a couple of the cases, she tries to make arguments that she was more qualified than the other folks, but she provides no citation to the record at all. Not to the record that was supplemental record. In regards to 24041, hearkening back to the October 2014 positions, Ms. Heisler testified she did not even know if that decision was discriminatory. She also testified that she thought Eric Ryan should get that position. She didn't even think she should get that position. In her appellate brief, she argued... Is that the person from Columbus? The name you just gave, is that the person from Columbus? Eric Ryan? Yes. That was a guy named Graham, right? Graham is the person who ultimately took the Harleysville position for $38,000 a year, less than what Ms. Heisler's offer was. So now tell me how this person plays into it. Tell me the last name. Ryan, did you say? Eric Ryan. Okay, good. Now tell me the role of this person. I'm sorry? Tell me the role of this person, Mr. Ryan. He plays several roles, but in the place where I was talking about, he is one of the people who applied for the three AVP positions in October 2014. Nationwide has a reorganization in the fall of 2014. Seven people that are Ms. Heisler's peers lose their jobs or are eliminated, and they all apply for these three AVP positions. Eric Ryan is one of the people who applied. Eric Ryan is a younger male. Eric Ryan also did not get any of the three positions. So for position 24041, that position was awarded to Pete Rothermel. Ms. Heisler's testimony was that Eric Ryan should have received that position, not that she should have received it. Counsel, isn't it correct that Mr. Ryan was also criticized for being too direct by the same supervisor, Mr. Crosser? That is correct. That is correct. Another example of the reason that the too direct thing is not gender specific, which is also, by the way, supported in the case law that we cited and that the district court cited. In her appellate brief in regards to 24041, Ms. Heisler argues that Mr. Rothermel had no relationship with the position's customers, lacked familiarity with the subject matter, and that she was well versed in it. This is on pages 19 to 20. Zero citation to the record. She makes statements over and over again with zero citation to the record, and it's simply not supported. With regard to 24042, again, at the district court level, she makes no arguments about comparative qualifications, and on appeal she argues that she's better qualified than Mr. Dielman. Again, on page 19 of her appellate brief, provides no citation to the record. With regard to 24044, that position was given to Renee French. Again, no argument about comparative qualifications before the district court. On appeal, she makes an argument on page 20, and she does provide a citation to the record, but the citation does not support her statement. In addition, as previously noted, Ms. French is female. In short, Ms. Heisler does not even establish that she was similarly qualified to the people who received the positions, let alone that she was significantly more qualified. And she certainly provides no evidence of discrimination, and this is a point that the district court makes, which is that both Eighth Circuit precedent and Supreme Court precedent are clear that the ultimate burden for Ms. Heisler is to prove discrimination. Somewhere, either in a strong prima facie case or in her pretext arguments, she has to and she simply does not do that. The fact that subjective factors were used in the interview process and in the hiring decision repeatedly has been determined not to necessarily show discrimination, particularly when we're talking about candidates who are similarly, at best, qualified for those positions. This is a situation that this court and other circuits around the country have addressed numerous times, and that is when you're looking at qualifications, when you're looking at business judgments, those judgments are left best to the employer when there is no reason to suggest that discrimination is at stake. You're right in your brief about the difficulties that the plaintiff had with constructive advice. In other words, is that one of the reasons she wasn't given what she wanted? That she was argued back and forth when suggestions were made? Was she an argumentative type of person? Well, I think the record does support that she had difficulty with constructive advice. She wouldn't listen to feedback and that sort of thing? Specifically, as it relates to the positions at issue here, the issue that Ms. Heisler has on appeal is that she has not provided this court, she did not provide the magistrate, she did not provide the district court with any evidence to suggest that she was even similarly qualified, let alone significantly more qualified. I'm running out of time, so I want to make sure I hit some points. Ms. Heisler admitted at oral argument at the district court that she was not challenging position 25283, so she cannot now do so. She provides no argument in her appellate brief regarding positions 25206 or 26721 or 35342. There are all kinds of other reasons that the judgment should be affirmed on those positions as well, but I don't know that we even need to get to that. On the evaluation, her performance evaluation, which she claims is an adverse action, she was given a high successful rating, so in and of itself that's difficult to understand, but when we filed our summary judgment motion and made an argument about the evaluation, Ms. Heisler didn't respond to that argument at all. She also, as a result of that, the magistrate determined that she had waived that argument. Ms. Heisler did not object to that determination and she has not appealed that determination from the district court, on top of which it simply was not an adverse action. In regards to the protected activity... The district court did address that though, right? On pages 34, 35, and 36, the district court does address that claim, the 2016 performance value. Yes, the district court addresses it and after determining that it was waived, the district court goes ahead and addresses it anyway and determines that it was not an adverse action. Ms. Heisler quoted her own testimony on pages 16 and 17 of her reply brief and argues that that testimony shows that she engaged in protected activity in May of 2013, but the testimony absolutely does not establish that. When asked whether she informed Ms. McVeigh that she believed the treatment was discriminatory, her answer was, quote, I don't believe so. I was still trying to understand the reason I was being treated the way I was. Ms. Heisler hadn't even determined at that point that there was discrimination at play. In her own mind, she obviously did not convey that to Ms. McVeigh. And the one piece she did not quote in her reply brief is on joint appendix 195. In that fact, Ms. Heisler testified that her email to Sarah Metzke, which was in November of 2014, was the first time she raised a concern of discrimination. Ms. Heisler makes statements about that in her brief that are, again, not supported by the record and frankly don't make any sense. On the Equal Pay Act claim, Ms. Heisler admitted in response to Statement of Fact 279 that Graham, Ryan, Diehlmann, and Rothermel were her only comparators and then made no argument before the district court about whether those individuals had jobs that were similar to hers in skill, effort, and responsibility. Zero. At the hearing, she added Bill Bowen. Does that change anything? At the hearing, she added Bill Bowen, but she had previously admitted that he was not. And regardless, in the record even now, there is no indication, no evidence that the skill, effort, and responsibility of the positions that those individuals held was similar to the skill, effort, and responsibility for the position that Ms. Heisler held. Very briefly on supplementing the record, yes, the district court has the discretion to allow supplementation of the record, but that discretion is very disfavored after the report and recommendation has been filed. That's in the Ridenhour case and also in the Madoff case. On top of which, in this instance, the things that Ms. Heisler wanted to add were comparator compensation, job descriptions for the positions she sought, resumes of a successful candidate, among other things. This is a failure to promote failure to hire case. It had to have been obvious that she needed those things in order to make her case, and yet she did not provide them in the first instance or in the six months that the motion was pending. We also briefed the fact in response to her request to supplement the record, which is in your record, we submit an opposition and illustrate why even if you accepted everything in the supplemental record, it wouldn't change the outcome in this case. Your time has expired, Counsel. This is not a failure to hire, failure to promote case. This is about what happens to someone's career at a company after they have been there 29 years and been promoted three times immediately before by the same male supervisor who lauds everything about her and, in particular, her communication. And this is at Joint Appendix 306. Look at the performance evaluation. What's the page reference? 306. Thank you. And he's rating her at the top level in communication. And what's important is that his testimony on this point, then, is in direct contravention to what's in the performance evaluation, Joint Appendix 434. He says, and I think we talked about feedback, this is Mr. Crosser, about that Nancy had gotten in the past around being too direct, her way or the highway. This is how you do it kind of thing, as opposed to being collaborative about it in the selling the group that you need to on where we were going. Counsel, how would you address the argument that Mr. Crosser seemed to have a particular problem with employees being too direct and he criticized a male employee for the same thing? Mr. Ryan testified to that, not Mr. Crosser's, in the depositions. Importantly, the only person that Mr. Crosser testified that he believed was too direct was, in fact, Nancy Heisler. I was referring to Ryan's testimony. I understand. Importantly, we have just from, Mr. Ryan was her direct supervisor at that point who reported to Crosser. Again, we should take that into account when we're determining at summary judgment whether or not judgment is appropriate under the circumstances. I want to address the fact that what we have here is after receiving three different promotions to an officer level over that period of time, what do we have today? We have someone who is still with the company but makes less today than she did in 2011 when this all began. She has been busted down at least four levels since that point. This was a desperate effort on her part to try to keep her job. That's what this is all about. It's not a failure to hire, failure to promote case. That's why she was asking for these positions because she was told that her position was being eliminated. In fact, she was placed on a 60 day notice and administrative leave. She was the only employee of the group, all three men who were employed. She was the only employee of the group. She was the only employee of the group who was able to keep their jobs. That's why she's trying to apply for these positions. She's trying to keep her career afloat here. This notion somehow of what Mr. Crosser was upset about, and I want to point the court to joint appendix number 432 because he tells us right in his deposition. He says about her request, well, I mean, I'd have to go back and look. It's probably close to what I made at the time. That's exactly what he was upset about. He was upset about the fact that she's asking for cost of living adjustment so that she can live in a suburb of Philadelphia when he remains in Des Moines and that amount would be close to what he made at the time. These terms, political savvy, executive presence, they're nowhere in her performance evaluations. I encourage the court to look at them. Again, look at joint appendix 306, 307, 308, the ones, the evaluations immediately before. They're stark. They're wonderful. I would love to have such a performance evaluation. After that, she's too direct. Remember that they say that Mr. Graham somehow was, at least initially, this notion about Harleysville. There is no question in the record, joint appendix 1357, that he was not required to go to Harleysville, to the suburb of Philadelphia. He was allowed to remain in Columbus and do the job in Columbus. Yes, he had to travel. No question about that. We concede that. But Ms. Heisler herself said in her email, in the email from which Mr. Crosser takes umbrage, that she herself on page 14 of the joint appendix was willing to do her current job and she was willing to do the other job as well. And she specifically stated that. What is the ultimate relief you seek? Obviously the first thing is a reversal and remand for trial, but ultimately what judgment would your client like to see entered following a jury verdict? Reinstatement to the position, the pay she wants, the location she wants? No, I don't think that needs to be that specific, but certainly the position and the pay differential between the point at which she first begins the fall and the present. So at least she remains at the level at which she had climbed in 2011 before she asked for the cost of living adjustment. So the jury would make a determination as to whether Mr. Crosser at that point began to treat her differently because of his perception of her and her request as a woman asking for this as being too direct in asking for additional cost of living adjustment. I suppose the question that we, or leave me, I might want to ask myself, to use an overworked metaphor, is the relief you seek based upon the evidence you presented a bridge too far to reach? It's not, because here's the thing, we don't even, the other positions simply are part of the story. What Nationwide attempts to do is to break each one of these down into a distinct event. They're not. They're part of the overall story here. She's applying for the positions because she's desperately trying to hold on to her career. She definitely has a job today, but her career is gone. That's what we're going to ask a jury to do, is to restore her career. She once was an officer. I mean, this notion somehow that she should not challenge the CFO. Remember what this is all about. This, by the way, occurs in 2011. And what she wants to challenge him about is his numbers. This is a publicly traded corporation. She's an officer of the company. She's coming forward and saying, I don't think they're right. Counsel, your time has expired. Thank you for the argument. Case number 18-1588 is submitted for decision by the court. Ms. O'Keefe. The next case for argument this morning is 18-1742. Jeffrey Klingenberg et al. versus  Ms. O'Keefe.